1

2

3

4

5

6

7

8                    **IN THE UNITED STATES DISTRICT COURT**

9                    **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11    JUAN ANTONIO LOPEZ,                          CASE NO. CV F 08-00817 LJO WMW HC

12                          Petitioner,            **ORDER DENYING PETITION FOR WRIT**
                                                   **OF HABEAS CORPUS WITH**
13           vs.                                   **PREJUDICE; DIRECTING CLERK OF**
                                                   **COURT TO ENTER JUDGMENT FOR**
14    WARDEN, HIGH DESERT                          **RESPONDENT; DECLINING ISSUANCE**
      STATE PRISON,                                **OF CERTIFICATE OF APPEALABILITY**
15

16                          Respondent.
      _____/
17

18           On June 11, 2008, Juan Antonio Lopez ("Petitioner"), a California prisoner proceeding with

19    counsel, filed a Petition for Writ of Habeas Corpus by a Person in State Custody pursuant to 28 U.S.C.

20    § 2254 ("Petition").[1]  On August 25, 2008, James E. Tilton ("Respondent") filed an Answer to the

21    Petition.  On September 9, 2008, Petitioner filed a Traverse.  Thus, this matter is ready for decision.

22                                    **PROCEDURAL HISTORY**

23           On July 28, 2005, a Kern County Superior Court jury convicted Petitioner of first degree murder

24    (Cal. Penal Code §§ 187, 189) and conspiracy to commit murder (*id.* § 182(a)(1)).  (3 Clerk's Tr. ("CT")

25    801, 813, 830.)  The jury found true that Petitioner committed both crimes (1) for the benefit of, at the

26    direction of, or in association with a criminal street gang and with the specific intent to promote, further,

27    _____

28           [1]      Although petitions for habeas corpus relief are routinely referred to a Magistrate Judge, *see* L.R. 72-302,
      the Court exercises its discretion to address the Petition pursuant to Local Rule 72-302(d).

                                                      1

or assist in criminal conduct by gang members (Cal. Penal Code § 186.22(b)(1)), (2) while Petitioner was an active participant of a criminal street gang and to further the activities of the criminal street gang (*id.* § 190.2(a)(22)), and (3) intentionally and personally discharging a firearm causing death (*id.* § 12022.53(d)). (3 CT 803-05, 815-17, 830). On August 24, 2005, the superior court sentenced Petitioner to life without the possibility of parole and a consecutive term of twenty-five years to life each on both counts, but stayed the sentence on the second count. (*Id.* 830.)

On August 24, 2005, Petitioner appealed his conviction and sentence to the California Court of Appeal. (CT 832.) On April 30, 2007, the court of appeal modified Petitioner's sentence on the second count to a term of twenty-five years to life and stayed it, but otherwise affirmed the conviction in a reasoned opinion. (Lodged Doc. ("LD") 27 at 56.) On July 11, 2007, the California Supreme Court summarily denied Petitioner's petition for review. (LD 29.)

On June 11, 2008, Petitioner filed his federal Petition in this Court.

## FACTUAL BACKGROUND[2]

This case arises out of the shooting death of Robert Moreno (the victim) on May 21, 2004. Because [Petitioner] does not challenge the sufficiency of the evidence to support his convictions or the associated enhancements, we briefly set out the essential facts, focusing on those relevant to the issues raised. We will also set out more fully facts pertinent to [Petitioner]'s specific contentions in the discussion section of this opinion.

### I.    *The prosecution*

The conflict that led to the fatal shooting of the victim began with a dispute between Adelaida (also known as Della) Moreno, the victim's aunt, and Diane Hyder, the sister of Pedro Valles. Hyder, at the invitation of Moreno, had been living with Moreno and Moreno's children in a house Moreno rented. Moreno and Hyder had a disagreement and, on May 21, 2004, Hyder was asked to move out of the house.

Hyder left the house that day in the late morning and, about two hours later, received a telephone call from Moreno's adult daughter, Daphnie Barrera, asking whether she was going to return and get her belongings. Hyder replied that she intended to return and warned that "... all her stuff better be there or else ...." and that "... nobody better had stole her stuff...." The victim and other relatives moved all of Hyder's possessions, including furniture, onto the front yard. Barrera testified that the victim was present at the house "... to protect the family ...." and had been invited by two of her aunts.

Later, on May 21, 2004, when [Petitioner] was done working, he persuaded his employer, Thomas Womack, to drive Valles and him somewhere, saying that he had

---

[2]    The Court adopts the factual background from the April 30, 2007, California Court of Appeal opinion on direct review as a fair and accurate summary of the evidence presented at trial. *See* 28 U.S.C. § 2254(e)(1); *Hernandez v. Small*, 282 F.3d 1132, 1135 n.1 (9th Cir. 2002).

2

someone with whom he wanted to visit.[3] Womack drove his pickup, and [Petitioner] directed him to the house where Hyder lived. During the drive, [Petitioner] and Valles spoke to each other in Spanish. Womack could not understand what they were saying.

After they arrived, [Petitioner] and Valles approached the house. Barrera's fiancé, Jose Hernandez, who had come out of the house, testified that Valles was angry, had his right hand in his pocket, and asked "Why is my sister's shit in the front yard?" Hernandez told Valles that he thought Hyder was moving out. Valles asked Hernandez if he was "Tony or Tiny." Hernandez said no. [Petitioner] went inside the house. Hernandez testified that before Valles went inside the house, he saw a gun handle as Valles was reaching into his right pocket.

Once inside the house, [Petitioner] asked the victim if he was "Tiny" or "Midget."[4] [Petitioner] fired a shot at the victim while the victim was in a chair in the living room. The victim jumped up and went into the kitchen. [Petitioner] followed and fired a second shot at the victim. The victim started to lose his balance. [Petitioner] fired several more shots at the victim. The victim collapsed in the garage next to the kitchen. The victim bled to death from his gunshot wounds.

Moreno had the kitchen telephone in her hand and was going to dial 911, when [Petitioner] pointed his gun at her and she dropped the telephone. [Petitioner] then pulled the telephone cord out of the wall.

[Petitioner], Valles, and Womack left in Womack's pickup truck. They drove to [Petitioner]'s house and left the pickup there.

Kern County Sheriff's Deputy Adam Plugge testified as a gang expert for the prosecution. Deputy Plugge testified that, in his opinion, [Petitioner] and Valles were active members of the Los Primos subset of the Loma Bakers criminal street gang, and the victim was an active member of the Southside Bakers. Deputy Plugge further testified the Loma Bakers and the Southside Bakers were rivals. Deputy Plugge also testified generally regarding the activities, culture, and territories of the gangs.

Although [Petitioner] does not challenge the sufficiency of the evidence supporting the gang enhancements, some of the evidence upon which the expert relied in reaching his opinion bears mentioning. The victim's forearm bore the tattoo of his moniker, "Mr. Midget." He had the tattoo "SSBKS" on his back, "Bakers" on his chest, and "Southside" on his forearm. Field identification cards reflected that the victim had claimed in the past to be an active member of the Southside Bakers.

[Petitioner] and Valles both had documented tattoos associated with the Loma Bakers and the Los Primos subset. Valles admitted being a member [of] Los Primos in interviews with detectives, and field identification cards and police reports also reflected admissions of gang membership.

[Petitioner]'s left forearm included the tattoos "Loma" and "XIII." His right inner arm included the tattoos "Loma" and "13." [Petitioner] had the tattoo "Primos" on his stomach. Field identification cards, dating from the 1990's, documented various police contacts with [Petitioner]. One field identification card, dated February 18, 1995, documented that he was contacted with a subject, either Carlos or Jesus Hyder, who was arrested for possession of a sawed-off shotgun. Another report showed that, in 1994,

---

[3]     [California Court of Appeal footnote 2:] Womack owned "AAA Pumping," a business that rents portable toilets and pumps septic tanks. Valles had been an employee of his for about three years. After Valles quit in 2003, [Petitioner] came to work for him and was Womack's only employee at the time of the shooting. Although he no longer employed Valles, Womack testified that he would occasionally lend Valles money and do things for him in order "... to keep him away...." Around the time of the shooting, Womack was paying for a motel room for Valles because Valles' place was being fumigated.

[4]     [California Court of Appeal footnote 3:] Relatives of the victim testified his nickname was "Midget" due to his small stature (approximately 4 feet 11 inches), and the gang expert testified that the victim's forearm included the tattoo "Mr. Midget."

3

[Petitioner] was contacted with Valles. Valles was seen waving a handgun, and was later arrested for possession of the handgun. [Petitioner]'s arrest reports reflected that in 1990, [Petitioner] and another subject were arrested for assault with a deadly weapon and were booked at juvenile hall. The juvenile transfer of custody sheet indicated that [Petitioner] claimed involvement in the case and claimed to be Los Primos.

On May 27, 2004, [Petitioner]'s house was searched pursuant to a search warrant. The sheriff's department seized a work-shirt with "Silent" printed on it, and three baseball caps. A number of photographs were also seized from [Petitioner]'s house and reviewed by Deputy Plugge. One of the photographs, bearing a stamp date of May 9, 2004, showed [Petitioner] making a peace sign with his right hand. Deputy Plugge explained this sign stands for Los Primos. Another photograph, bearing a date stamp of May 7, 2005, showed Valles with a jersey with his last name and the number 13.

Two other photographs showed [Petitioner] or Valles "throwing" gang signs with their hands which stood for Los Primos. One photograph showed [Petitioner] signing a "P" with his right hand. Another showed Valles sitting and throwing a "P" sign with his right hand and an "L" sign with his left hand. Another person in this photograph appeared to be holding a sawed-off shotgun. [Petitioner]'s gang moniker, "Silent," was written on the wall in the background of the photograph.

After being presented with a hypothetical based on the evidence in the case, including Valles' claim that he spoke with the victim on the telephone before the shooting and that the victim threatened to harm Valles' sister and nephew, Deputy Plugge testified that, in his opinion, the shooting was done for the purpose of furthering the Loma Bakers criminal street gang. Deputy Plugge explained:

> "In the hypothetical that you gave me, you had two Loma Bakers that go over to a residence of a rival gang member's house after a disrespect or after a threat was made to one of the gang members. Um, threats fall under disrespecting to gang members. If you threaten a gang member, it's a sign of disrespect. [¶] ... [¶]
>
> "Um, again, the two gang members that go over to a house, um, they only shoot the rival gang member that disrespected one of the other gang members.
>
> "And the fact that you have two gang members that go over there, um, again, strength in numbers, it's not uncommon for gang members to go in pairs and threes and fours over to residences or houses and commit their crimes.
>
> "In addition to that, that second gang member is a trusted associate or a trusted gang member of the other gang member; so they – the thinking is or the belief is that they're not going to be the ones that are going to give out on them or tell on them or tell the cops on them.
>
> "And thirdly, when you have a second gang member there present during an incident involving other gang members that gang member acts as a witness, um, that that crime was committed or that that gang member or these gang members committed that crime and did that act, um, which further promotes their reputation within the community, um, going back again to the fear and intimidation that gang members – gang members, um, are able to live by in our community."

Deputy Plugge testified his opinion would be the same even assuming "... the sequence of the events involved getting a non-gang member, somebody who is the current employer of one of the Loma Bakers and the former employer of one of the other Loma Baker[s] to actually drive them to the scene in a readily identifiable company truck and there's enough daylight out on the street for witnesses to actually see the truck, see people getting out, and actually making note of the license plate." Although Deputy Plugge acknowledged this was "... a non-typical fact for a gang shooting ....", he was still

4

of the opinion that the shooting itself was done for the purpose of furthering the gang, explaining: "Due to the fact that he's an employer, possibly another trusted person, the belief that he may not be the one that is going to, uh, again be the weak link in the chain and tell on the other two gang members that are over there."

### *The defense*

The theory of the defense was that Valles was the one who shot the victim and that he acted alone. Valles, who was also charged with the May 21, 2004, murder and was awaiting trial, testified for the defense over the advice of his counsel and after being admonished of his rights by the court.

Valles testified that although he had quit working for Womack a year earlier, he was planning to work for him on May 21, 2004, as an "under-the-table thing." Valles knew [Petitioner] was going to be his coworker that day. He called [Petitioner] in the morning, and asked [Petitioner] to drive him to a park where he had a prearranged visitation with his eight-year-old daughter. Afterwards, [Petitioner] drove Valles to the job site.

Valles and Womack later went to a Taco Bell to get something to eat, while [Petitioner] remained at the job site. While Womack was ordering food, Valles' sister called him on his cell phone and explained the situation where she was staying and gave him a telephone number for the house. Valles called the house and spoke to someone who lived there. That person made threats and talked about killing Valles' sister and her son. Valles testified that in response, "... I told him, you going to take my nephew's life, then I'll be over there ...." and "... pre warned him that I was going." Valles did not tell Womack about the telephone call.

Womack drove Valles to the motel where he was staying. Womack was supposed to be dropping Valles off but then [Petitioner] arrived and reminded them they still had another job site to go to.

Valles rode to the other job site with [Petitioner] and Womack in Womack's pickup truck. He did not tell either of them about the telephone call he had received. After they finished working, Valles asked them to give him a ride. Womack was driving, and Valles directed him to the house where his sister lived. Valles explained to them that the stuff in the front of the house was his sister's. After they arrived at the house, Valles told [Petitioner] and Womack they could leave, but Womack said they would just sit and wait for him.

Valles got out of the truck and walked up to the house. He saw this "clown" sitting on the front porch and asked him if he was "Tiny" or "Midget." That person pointed inside the house. When he went inside the house, Valles was feeling angry and enraged because his sister's belongings had been "... thrown out there like trash." Valles described the shooting incident as follows: "I walked in. I seen that fool laying there. I asked him, you Tiny? You Midget? He jumped up, started running. Apparently he had to be, right? So I shot, chased him down, and killed him."

Valles did not tell [Petitioner] or Womack what his intentions were or what he was going to do before he went inside the house. When asked where he got the gun he used, Valles responded that he "always pack[s]." Valles did not see any other guns that day. Valles testified that [Petitioner] did not help him perpetrate the shooting in any way.

Valles became an uncooperative witness during cross-examination and refused to answer questions about the specific details of the shooting, including questions about how his gun worked, where he was aiming on the victim's body, and his movements inside the house. Ultimately, Valles refused to answer any more questions from either the prosecutor or defense counsel.

(LD 27 at 3-9.)

## **PETITIONER'S CLAIMS**

1.    The trial court's alteration of California Jury Instructions – Criminal ("CALJIC") 17.24.3

violated Petitioner's due process right to a fair trial and right to a jury trial because the altered instruction vitiated the jury's findings (Pet. 2; Pet. Mem. 4-9); and

2.    The trial prosecutor's misconduct in eliciting an in-court identification of Petitioner in an unlawful and inappropriate manner violated Petitioner's due process right to a fair trial (Pet. 2; Pet. Mem. 9-13).

**STANDARD OF REVIEW**

The current Petition was filed after the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 ("AEDPA"), was signed into law and is thus subject to its provisions. *See Lindh v. Murphy*, 521 U.S. 320, 326-327 (1997). The standard of review applicable to Petitioner's claims is set forth in 28 U.S.C. § 2254(d), as amended by the AEDPA:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under the AEDPA, the "clearly established Federal law" that controls federal habeas review of state court decisions consists of holdings (as opposed to dicta) of Supreme Court decisions "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). To determine what, if any, "clearly established" United States Supreme Court law exists, the court may examine decisions other than those of the United States Supreme Court. *LaJoie v. Thompson*, 217 F.3d 663, 669 n.6 (9th Cir. 2000). Ninth Circuit cases "may be persuasive." *Duhaime v. Ducharme*, 200 F.3d 597, 598 (9th Cir. 2000) (as amended). On the other hand, a state court's decision cannot be contrary to, or an unreasonable application of, clearly established federal law if no Supreme Court precedent creates clearly established federal law relating to the legal issue the habeas petitioner raised in state court. *Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir. 2004); *see also Carey v. Musladin*, 549 U.S. 70, 76-77 (2006).

A state court decision is "contrary to" clearly established federal law if the decision either applies

a rule that contradicts the governing Supreme Court law, or reaches a result that differs from the result the Supreme Court reached on "materially indistinguishable" facts. *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam); *Williams*, 529 U.S. at 405-06. When a state court decision adjudicating a claim is contrary to controlling Supreme Court law, the reviewing federal habeas court is "unconstrained by § 2254(d)(1)." *Williams*, 529 U.S. at 406. However, the state court need not cite or even be aware of the controlling Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8.

State court decisions which are not "contrary to" Supreme Court law may only be set aside on federal habeas review "if they are not merely erroneous, but 'an *unreasonable* application' of clearly established federal law, or are based on 'an *unreasonable* determination of the facts.'" *Early*, 537 U.S. at 11 (*quoting* 28 U.S.C. § 2254(d)). Consequently, a state court decision that correctly identified the governing legal rule may be rejected if it unreasonably applied the rule to the facts of a particular case. *Williams*, 529 U.S. at 406-10, 413; *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002) (per curiam). However, to obtain federal habeas relief for such an "unreasonable application," a petitioner must show that the state court's application of Supreme Court law was "objectively unreasonable." *Woodford*, 537 U.S. at 24-25, 27. An "unreasonable application" is different from an "erroneous" or "incorrect" one. *Williams*, 529 U.S. at 409-10; *see also Waddington v. Sarausad*, 129 S. Ct. 823, 831 (2009); *Woodford*, 537 U.S. at 25.

A state court factual determination must be presumed correct unless rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Furthermore, a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005).

## DISCUSSION

### Claim One

In his first claim, Petitioner alleges the trial court's alteration of CALJIC 17.24.3 violated Petitioner's due process right to a fair trial and right to a jury trial because the altered instruction vitiated the jury's findings. (Pet. 2; Pet. Mem. 4-9.) Because the California Supreme Court summarily denied this claim, the Court must "look through" to the last reasoned decision, that of the California Court of

Appeal on direct review. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-05 (1991). In rejecting Petitioner's claim, the court of appeal stated:

> The defense requested that the court instruct the jury with CALJIC No. 17.24.3. Over defense counsel's objection, the court agreed to give a modified version of the instruction proposed by the prosecutor, which told the jury:
>
> > "Evidence has been introduced for the purpose of showing criminal street gang activities, and of criminal acts by gang members, other than the crimes for which the defendant is on trial.
> >
> > "Except as you will be otherwise instructed, this evidence, if believed, may not be considered by you to prove that the defendant is a person of bad character or that he has a disposition to commit crimes. It may be considered by you only for the limited purpose of determining if it tends to show that the crime or crimes charged were committed for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members. *The opinions by Deputy Plugge may also be considered by you in determining if aiding and abetting and/or conspiracy have been proved.*
> >
> > "For the limited purpose for which you may consider this evidence, you must weigh it in the same manner as you do all other evidence in the case." (Italics added.)
>
> On appeal, [Petitioner] contends the court erred in allowing the addition of the language concerning Deputy Plugge, in place of bracketed language in CALJIC No. 17.24.3, which reads: "You are not permitted to consider such evidence for any other purpose." The prosecutor's rationale below for the modification was that the instruction was misleading in that it erroneously suggested that the jury could only consider gang evidence in connection with the gang enhancement allegations despite authority that the gang evidence was also relevant to the aiding and abetting and conspiracy allegations. Defense counsel countered that the modification overemphasized the expert's opinions on those issues, and that other CALJIC instructions properly covered the subject of expert opinion evidence and the use of hypotheticals.
>
> Building on his arguments below, [Petitioner] now contends that the instruction incorrectly told the jury that it could consider the gang evidence to determine he was guilty of murder, and that it usurped the jury's factfinding function by "clearly inviting the jury to take the expert's opinion' [sic] as fact." [Petitioner] contends the modified instruction essentially "... advises the jury that if the expert said [[Petitioner]] is a gang member and the murder was committed for the benefit of his gang – then the murder did happen and [[Petitioner]] is the one who did it." We disagree with [Petitioner]'s arguments.
>
> CALJIC No. 17.24.3 informs the jury that gang evidence may not be considered to prove the defendant is a person of bad character or has a disposition to commit crimes, but only to show the charged offenses were committed for the benefit of, at the direction of, or in association with a criminal street gang. As discussed above, [Petitioner]'s gang affiliation provided a motive for shooting the victim and therefore the gang evidence was relevant and admissible regarding not only the gang enhancements but also the charged offenses. Thus, to the extent the modification told the jury it could consider the gang evidence in determining [Petitioner]'s guilt of the offenses, it was not legally erroneous as [Petitioner] claims. Once gang evidence is admitted, much of it is relevant to, and can be considered regarding, the charged offenses. (*People v. Hernandez*, *supra*, 33 Cal.4th at pp. 1049, 1053.)
>
> However, even assuming the court erred in failing to give CALJIC No. 17.24.3

unaltered, any error was harmless. *People v. Hernandez, supra,* 33 Cal.4th 1040 (*Hernandez*) is instructive. In *Hernandez,* our Supreme Court found no ineffective assistance in the failure to request such an instruction. (*Id.* at p. 1053.) As pertinent here, the court also found any ineffective assistance in not requesting an instruction was harmless. It noted that "the jury *could* properly consider most of the gang evidence on guilt, although not merely as showing that defendants were bad people. No one suggested that defendants should be found guilty solely because they were bad people.... Accordingly, a limiting instruction would not have significantly aided defendants under these facts or weakened the strength of the evidence of guilt the jury properly could have considered." (*Hernandez, supra,* 33 Cal.4th at p. 1054.)

The facts are comparable here. The gang evidence was admissible to show guilt by showing motive, and no one suggested [Petitioner] was guilty just because he was a gang member. Notwithstanding the minor modification, the limiting instruction given here explicitly told the jury that the gang evidence, "if believed, may not be considered by you to prove that defendant is a person of bad character or that he has a disposition to commit crimes." Furthermore, we find no merit in [Petitioner]'s claim that the added language usurped the jury's fact-finding function. Contrary to [Petitioner]'s assertion, nothing in the modified version of CALJIC No. 17.24.3, "invited the jury to take the expert's 'opinion' as fact." Moreover, as mentioned above, the jury was properly instructed on the use of expert opinion evidence and specifically instructed that it was not bound by the expert's opinion. For all these reasons, we reject [Petitioner]'s claim of instructional error.

(LD 27 at 53-55.)

"[N]ot every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation." *Middleton v. McNeil,* 541 U.S. 433, 437 (2004); *see also Waddington,* 129 S. Ct. at 831. Rather, the question is whether "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Estelle v. McGuire,* 502 U.S. 62, 72 (1991) (*quoting Cupp v. Naughten,* 414 U.S. 141, 147 (1973)); *Henderson v. Kibbe,* 431 U.S. 145, 154 (1977). An ambiguous or erroneous instruction is reviewed to determine "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violated the Constitution. *Estelle,* 502 U.S. at 72. "The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal." *Henderson,* 431 U.S. at 154. The instruction must be considered in the context of the trial record and the instructions as a whole. *Estelle,* 502 U.S. at 72. "Unless there is a likelihood that the jury applied the instructions in a way that lessens the prosecution's burden of proof, we review instructional error under the harmless error standard." *Mendez v. Knowles,* 556 F.3d 757, 768 (9th Cir. 2009) (*citing Hedgpeth v. Pulido,* 129 S. Ct. 530, 532 (2008)).

Here, Petitioner, represented by counsel, fails to show any error or ambiguity in the trial court's modified CALJIC 17.24.3 instruction. As stated by the court of appeal, unaltered CALJIC 17.24.3 "informs the jury that gang evidence may not be considered to prove the defendant is a person of bad character or has a disposition to commit crimes, but only to show the charged offenses were committed for the benefit of, at the direction of, or in association with a criminal street gang." (LD 27 at 54.) The modification to the instruction allowing, but not requiring, the jury to consider gang expert opinion on the underlying charges is supported by Petitioner's "gang affiliation provid[ing] a motive for shooting the victim." (*Id.*); *see Schwendeman v. Wallenstein*, 971 F.2d 313, 316 (9th Cir. 1992) (stating a jury instruction is constitutionally sound if it creates a permissive inference that allows, but does not require, the jury to infer an essential fact from proof of another fact so long as "the inferred fact is more likely than not to flow from the proved fact on which it is made to depend") (citations and internal quotation marks omitted); *see also County Court v. Allen*, 442 U.S. 140, 157 (1979) (stating permissive inferences allow but do not require the trier of fact to infer the elemental fact from proof by the prosecutor of the basic one and place no burden of any kind on the defendant).

In addition, reading CALJIC 17.24.3 together with the other instructions given to the jury, *see Estelle*, 502 U.S. at 72, alleviates any alleged error or ambiguity in CALJIC 17.24.3. The jury was instructed that it was not bound by an opinion, and that it could give each opinion the weight it deserves or disregard any opinion it found unreasonable. (*See* 3 CT 734.) The jury was also instructed of the prosecution's burden to prove every element of the charges beyond a reasonable doubt. (*See id.* 737-38.) A jury is presumed to have followed the court's instructions. *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000).

Accordingly, the Court finds that CALJIC 17.24.3 as given at Petitioner's trial did not "so infect[] the entire trial that the resulting conviction violates due process." *Estelle*, 502 U.S. at 72. Even assuming some error in CALJIC 17.24.3, it did not have a "substantial and injurious effect or influence in determining the jury's verdict." *See Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993). As stated by the court of appeal, two eyewitnesses positively identified Petitioner as the shooter: Moreno and her daughter, Daphnie Barrera. (LD 27 at 38.) In addition, although the defense theory was that Valles was the shooter, Valles became an uncooperative witness during cross-examination and refused to answer

questions about the specific details of the shooting, including questions about how his gun worked, where he as aiming on the victim's body, and his movements inside the house. (*See id.* at 9.)

For the foregoing reasons, the Court finds that the California courts' rejection of Petitioner's jury instruction claim was neither contrary to, nor an unreasonable application of, clearly established federal law as determined by the United States Supreme Court. Thus, habeas relief is not warranted on this claim.

### Claim Two

In his second and final claim, Petitioner asserts that the trial prosecutor's misconduct in eliciting an in-court identification of Petitioner in an unlawful and inappropriate manner violated Petitioner's due process right to a fair trial. (Pet. 2; Pet. Mem. 9-13.) Because the California Supreme Court summarily denied this claim, the Court must "look through" to the last reasoned decision, that of the California Court of Appeal on direct review. *See Ylst*, 501 U.S. at 803-05. In rejecting Petitioner's claim, the court of appeal stated:

> Under the argument heading "Tainted Identification," [Petitioner] contends that, during the examination of the victim's aunt, Adelaida Moreno, the prosecutor employed "unduly suggestive" tactics to elicit an in-court identification of [Petitioner] in violation of his due process rights. [Petitioner] also contends that the prosecutor's tactics constituted prosecutorial misconduct. We reject [Petitioner]'s contentions.
>
> ### A.  *Applicable legal principles*
> Preliminarily, we note [Petitioner]'s due process claim rests on inapposite case authority pertaining to *extrajudicial* identification procedures, namely photographic and physical lineups utilized by law enforcement agents prior to trial. (See e.g., *People v. Yeoman* (2003) 31 Cal.4th 93, 123; see also *People v. Carpenter* (1997) 15 Cal.4th 312, 366-367.) "Due process requires the exclusion of identification testimony only if the identification procedures used were unnecessarily suggestive and, if so, the resulting identification was also unreliable. [Citations.]" (*People v. Yeoman*, *supra*, 31 Cal.4th at p. 123, citing, *inter alia*, *Manson v. Brathwaite* (1977) 432 U.S. 98, 106-114.) The issue, when deciding whether an identification procedure was "unduly suggestive," is "'whether anything caused defendant to "stand out" from the others in a way that would suggest the witness should select him.'" (*Yeoman*, *supra*, at p. 124.)
>
> [Petitioner] does not contend that the witness's in-court identification should have been excluded as the product of an unduly suggestive pretrial or extrajudicial identification procedure as was contended by the defendants in the cases he cites. Rather, he contends that the prosecutor used unduly suggestive tactics in examining Moreno which caused [Petitioner] to "stand out" and thus lead her to identify [Petitioner] as the individual who came into her house and shot the victim. The inapplicability of [Petitioner]'s case authority to this context is obvious and does not merit extended discussion. Instead, we review [Petitioner]'s claim solely as one of prosecutorial misconduct.
>
> "The applicable federal and state standards regarding prosecutorial misconduct are well established. "'A prosecutor's ... intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial

11

with such unfairness as to make the conviction a denial of due process.'"' [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves "'"the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury."'" [Citation.] As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion – and on the same ground – the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. [Citation.]" (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.)

[Petitioner]'s misconduct claim focuses on two areas of the prosecutor's examination of Moreno: (1) the prosecutor's questioning regarding a six-person photographic lineup she was shown four days after the shooting; and (2) Moreno's testimony identifying [Petitioner] as the person who came into her house. We see nothing in the prosecutor's questioning of Moreno which involved the use of deceptive or reprehensible methods, or which infected the trial with unfairness.

### B.     *General background*

At trial, two eyewitnesses positively identified [Petitioner] as the shooter: Moreno and her daughter, Daphnie Barrera. While Moreno had difficulty recalling what [Petitioner] was wearing at the time of the shooting or other identifying features, Barrera described [Petitioner] as being tall, having a moustache, and wearing a baseball cap. Her description of [Petitioner]'s appearance, particularly the detail of the baseball cap, was consistent with descriptions given by other witnesses who were at or near Moreno's house on May 21, 2004.[5]

Prior to trial, the witnesses did not immediately identify [Petitioner] as the shooter. On the night of the shooting, Barrera spoke with Deputy Ryan Dunbier. Deputy Dunbier testified that Barrera told him that the shooter was a Hispanic male, was wearing a baseball cap, and was approximately 5 feet 8 inches to 5 feet 10 inches tall. However, Barrera identified the shooter as the brother of her former roommate. She could only identify him as "Gato," which was Valles' gang moniker. Barrera explained to the deputy that she recognized Gato from a photograph her roommate had shown her.

On June 3, 2004, Detective Danny Edgerle showed Barrera a photographic lineup which included [Petitioner]'s photograph in the number five position. Detective Edgerle testified that Barrera studied the photographs for several minutes and hesitated before directing his attention to [Petitioner]'s photograph. Barrera said she believed he was the person in the house on the day of the shooting and that he looked like the person who shot the victim. When asked how certain she was on a scale of one to 10, Barrera replied "six," and noted that the shape of his face was what stood out to her. She also commented that the shooter had been wearing a baseball cap.

On the night of the shooting, Detective Edgerle interviewed Moreno and showed her a photographic lineup which included a photograph of Valles in the number four position. A tape of the interview was played to the jury. Detective Edgerle asked Moreno to look at the photographs and tell him if she saw the person who committed the crime. She pointed to Valles' photograph. The detective asked her if that picture was standing out to her. She responded, "Looks like him but I don't know." She also indicated that she thought he was too light and too fat to be the person she saw inside the house. She thought the photograph looked like Hyder's brother. When asked, on a scale of one to 10, if he looked like Hyder's brother *and* like the person who came in and shot the victim, Moreno answered "seven."

On May 25, 2004, Detective Laura Lopez showed Moreno the photographic lineup which had [Petitioner] in the number five position. Moreno pointed to [Petitioner]'s photograph and stated he was the man present during the shooting and indicated she was positive of her identification. Detective Lopez did not engage Moreno

---

5        [California Court of Appeal footnote 7:] In contrast, witnesses described Valles as being bald with tattoos on his head.

12

in a detailed discussion regarding his role in the shooting. On cross-examination, Detective Lopez confirmed that Moreno did not tell her that she saw [Petitioner] with a firearm, and that she would have documented that in her report if Moreno had done so.

### C.    Analysis

#### 1.    The prosecutor's questions regarding the photographic lineup

During direct examination, the prosecutor displayed on a television screen the photographic lineup Deputy Lopez had shown Moreno, and asked: "Okay. Now, uh, do you see the guy in this lineup of photographs? Do you see his picture there, the guy that came in and shot?" Defense counsel interjected an objection based on prosecutorial misconduct and an unreported sidebar was held. After the sidebar concluded, the court stated for the record that the objection had been overruled, and then agreed to defense counsel's request to "have a continuing objection to this line of questioning."[6]

When the prosecutor resumed questioning the witness, he asked her if she recognized any of the people in the photographs from the day of the shooting. Moreno answered affirmatively and the prosecutor then asked her to identify the photograph by stating the number underneath it. Moreno replied, "Five." Next the prosecutor pointed to the photograph she selected and asked her if that was the one she was talking about. Moreno responded that it was. The following exchange then occurred:

> "Q. Where do you recognize him from? What did you see him do that day?
> "A. He came in – he came in the house.
> "Q. And did what?
> "A. Shot my nephew."

Skipping a number of steps in the prosecutor's line of questioning, [Petitioner] asserts:

> "The prosecutor's conduct in showing Ms. Moreno a blown-up six-pack and then prompting her to identify him as the shooter by stating 'do you see the guy that came in and shot' and then pointing to [[Petitioner]] on the TV screen and saying 'what did you see him do' was blatantly designed to encourage her to just adopt the prosecutor's characterization that [[Petitioner]] was the shooter.... There can be no question that the prosecutor's action was designed not so much to single [[Petitioner]] out, as this had already been done because slot # 5 had already been selected in the six-pack, but rather to force Ms. Moreno to identify [[Petitioner]] as the *shooter* by characterizing him as the shooter, *then* asking her to identify him, thereby adopting the characterization. [[Petitioner]] maintains that this was not only an unduly suggestive, tainted and unreliable identification, but that the prosecutor committed gross misconduct." (Italics in original.)

---

[6]    [California Court of Appeal footnote 8:] Later during a break, the parties made a record of what transpired during the sidebar. Defense counsel stated that he had objected on grounds of prosecutorial misconduct because the prosecutor was leading the witness and implying to the jury that Moreno had previously identified [Petitioner] as the shooter to the sheriff's deputies, which defense counsel characterized as a "blatant representation." Defense counsel also moved for a mistrial or, alternatively, to strike Moreno's identification of [Petitioner] based on the prosecutor's subsequent conduct, which is the second area of [Petitioner]'s prosecutorial misconduct claim on appeal. In that regard, defense counsel argued: "And it was also suggestive to this witness, including the identification of the [Petitioner], saying this is the [Petitioner] in the green shirt, this is Juan Lopez, do you recognize him prior to her making the identification of Juan Lopez after she had already said she did not recognize Juan Lopez or recognize the gentleman in the green shirt and then said she remembered something about the eyes and the nose...."

When viewed in context, we disagree that the prosecutor's questions were designed to or had the effect of forcing the witness to identify [Petitioner] as the shooter. [Petitioner]'s above argument implies that the prosecutor jumped directly from asking Moreno if she saw "the guy who came in and shot" to pointing to [Petitioner]'s picture on the television screen and asking her "what did you see him do," thus prompting her to link him to the shooting. This is not what happened. While the prosecutor's first question ("Do you see his picture there, the guy that came in and shot?") was arguably leading (the basis of the prosecutorial misconduct objection), any leading effect would have been lessened by the intervening sidebar. When questioning resumed, the prosecutor asked a series of nonleading questions. The prosecutor did not point to [Petitioner]'s picture until *after* Moreno testified that she recognized someone in the photographs and identified [Petitioner]'s picture without any improper prompting or coaching by the prosecutor. Moreover, [Petitioner] cites no authority to support his suggestion that the prosecutor somehow acted improperly by asking Moreno questions about the photograph rather than simply asking her whether she recognized the perpetrator of the crime in the courtroom. The photographic lineup Moreno viewed within days of the shooting was relevant and a proper subject of examination in this case.

### 2. Moreno's in-court identification of [Petitioner]

[Petitioner] next contends the prosecutor committed misconduct in his subsequent line of questioning, which ended with Moreno identifying [Petitioner] in court as the man who came into her house. This line of questioning unfolded as follows:

> "[THE PROSECUTOR]: Q. Okay. I want to direct your attention over across the courtroom.
> "For the record – okay? – can you see where I'm standing?
> "A. (Nods head.) Yes.
> "Q. Okay. I want you to look at the man that's sitting down in front of me. He's wearing a green shirt. For the record, he's wearing glasses. And he's the [Petitioner] in this case – okay? Juan Lopez. Okay? I want you to take a look at him. Okay?
> "(The witness complied.)
> "Q. And if you need to see him from a different angle, just tell us. If you need him to stand up, just tell us, and we'll do that. If you need him to take off the glasses, tell us and we'll do that. Okay?
> "[DEFENSE COUNSEL]: Objection; leading and compound.
> "THE COURT: Overruled.
> "THE WITNESS: I – I don't – the glasses – he didn't have no glasses.
> "[THE PROSECUTOR]: Q. Okay. Well, do you want him to take the glasses off right now?
> "A. (Nods head.) Yes.
> "[THE PROSECUTOR]: Your Honor, may I have an order to that effect?
> "THE COURT: Yes.
> "([Petitioner] complied.)
> "[THE PROSECUTOR]: Q. I want you to be totally honest with us, Ms. Moreno. Okay? Don't tell us anything that's partially not true. Okay?
> "First of all, do you recognize [Petitioner], the gentleman sitting right here, from the night of the shooting? And if you don't, just tell us you don't.
> "A. I don't remember.
> "Q. Okay. Do you want him to turn at all?
> "A. Yes. Just – his eyes and his nose.
> "Q. What about them?

14

"A. I recognize his eyes and his nose, but I don't recall his – if he had one of these.

"Q. Okay. You're making a motion, and I have to make a record. Are you saying a mustache?

"A. Yeah. I don't remember if he had a mustache. I – his eyes and –

"[THE PROSECUTOR]: Can I have the [Petitioner] turn so she can see him?

"THE COURT: Yeah. Why don't you stand up, [Petitioner], and kind of face the witness. And turn so she can take a glance at you, sir.

"([Petitioner] complied.)

"THE WITNESS: Yes. That's him.

"THE COURT: Thank you.

"You may be seated.

"[THE PROSECUTOR]: Q. You just said what?

"A. Yes.

"Q. What?

"A. That's him. That's the man who came in my house."

Based on the forgoing, [Petitioner] now contends:

"The unduly suggestive nature of this move by the prosecutor is unquestionable. He stood behind [[Petitioner]], identified what he was wearing, where he was seated, that he was the 'defendant' and what his name was – a name that would have been known to all of the witnesses via their subpoenas. He had [[Petitioner]] stand up, remove his glasses and turn his position before the witness. If ever there was a procedure that caused a [Petitioner] to 'stand out' in a way to suggest the witness should select him, this was it. Naturally, Ms. Moreno identified him, but only as 'coming in the house.' It was not until further prodding by the prosecutor that she said he 'shot my nephew.'[[7]]

"The best evidence of the unreliability of Ms. Moreno's identification is the inconsistency of her identifications within minutes of each other. When shown the blown-up six-pack, she identified [him]. When asked to look at him live in the courtroom, she did not recognize him. For these reasons, [[Petitioner]] maintains that his due process right to a fair trial was violated, and as such, he respectfully requests that his convictions be reversed."

[Petitioner]'s argument does not identify any actions by the prosecutor which constituted misconduct. Questioning on direct examination by a prosecutor is not analogous to an extrajudicial identification procedure and language in cases [Petitioner] cites about examining whether an identification procedure caused a defendant to "stand out" from other suspects is simply not pertinent here. There were no other suspects with whom the witness was comparing [Petitioner], and [Petitioner] offers no authority to support his assertion that it was improper for the prosecutor to point out the [Petitioner] to the witness and refer to him by his name or to have him stand, remove his glasses, and turn towards the witness.

In any event, we find nothing inappropriate about the prosecutor asking the

---

[7]     [California Court of Appeal footnote 9:] This sentence is inaccurate. Moreno did not go on to testify that [Petitioner] shot her nephew in this particular line of questioning, which was followed directly by cross-examination. [Petitioner] provides no record citation but he appears to be referring to Moreno's earlier testimony regarding the photographic lineup.

15

court's permission to have [Petitioner] move so the witness could view him better, particularly in light of the witness's testimony that she thought she recognized [Petitioner]'s eyes and nose but not his mustache. According to various witness accounts, [Petitioner]'s appearance had changed considerably since the time of the shooting. Thus, it was not unreasonable or unusual to ask [Petitioner] to make minor alterations in his appearance to make it more consistent with how it was around the time of the incident.

In short, [Petitioner]'s allegations of prosecutorial misconduct, unsupported in many instances by citations to the law or to the record, are without substance. We cannot find a single example of "'"'deceptive"'" or "'"'reprehensible"'" conduct so egregious that it "'"'infect[s] the trial with [such] unfairness as to make the resulting conviction a denial of due process.'"'" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1000.) Thus, [Petitioner] has failed to demonstrate prosecutorial misconduct under either state or federal standards.

(LD 27 at 36-45.)

A habeas petition alleging prosecutorial misconduct will be granted only when the misconduct did "so infect the trial with unfairness as to make the resulting conviction a denial of due process." *Greer v. Miller*, 483 U.S. 756, 765 (1987) (*quoting Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)); *see also Darden v. Wainwright*, 477 U.S. 168, 181 (1986). "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). A prosecutor's challenged remarks are viewed in the context of the entire trial. *See Greer*, 483 U.S. at 765-66; *see also Donnelly*, 416 U.S. at 639-43. In addition, any prosecutorial misconduct must have "had substantial and injurious effect or influence in determining the jury's verdict." *Sechrest v. Ignacio*, 549 F.3d 789, 808 (9th Cir. 2008) (*quoting Brecht*, 507 U.S. at 622).

With regard to the Petitioner's claim that the prosecutor was unduly suggestive while utilizing the photographic six-pack, the Court agrees with the court of appeal that the "prosecutor did not point to [Petitioner's] picture until *after* Moreno testified that she recognized someone in the photographs and identified [Petitioner's] picture without any improper prompting or coaching by the prosecutor." (*See* LD 27 at 41; 6 Rep.'s Tr. ("RT") 1316-17.) The prosecutor's pointing to Petitioner's photograph was in response to Moreno's identification, and Petitioner fails to show how this "so infect[ed] the trial with unfairness as to make the resulting conviction a denial of due process." *Greer*, 483 U.S. at 765.

The Court also agrees with the court of appeal's analysis of Moreno's in-court identification of Petitioner as conducted by the prosecutor. Petitioner fails to show the impropriety of the prosecutor standing next to Petitioner at trial, referring to him by name, and having him stand, remove his glasses,

and turn toward Moreno.  This is further supported by Moreno's testimony that she recognized Petitioner's eyes and nose.  (*See* 6 RT 1329.)

Even assuming constitutional error on the prosecutor's part, his conduct did not have a "substantial and injurious effect or influence in determining the jury's verdict," as discussed in Claim One, *supra*.  *Brecht*, 507 U.S. at 631.

Accordingly, the Court finds that the California courts' rejection of Petitioner's prosecutorial misconduct claim was neither contrary to, nor an unreasonable application of, clearly established federal law as determined by the United States Supreme Court.  Thus, habeas relief is not warranted on this claim.

### Certificate of Appealability

An applicant seeking to appeal a district court's dismissal of a habeas petition under 28 U.S.C. § 2254 must first obtain a certificate of appealability ("COA") from a district judge or circuit judge.  28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1).  A judge should either grant the COA or state reasons why it should not issue, and the COA request should be decided by a district court in the first instance. Fed. R. App. P. 22(b)(1); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th Cir. 1997).

The applicant for a COA must make a "substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2); *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003); *Slack v. McDaniel*, 529 U.S. 473, 483 (2000).  A "substantial showing" is defined as a demonstration (1) that the issues are debatable among jurists of reason; (2) that a court could resolve the issues differently; or (3) that issues are adequate to deserve encouragement to proceed further.  *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983); *see Slack*, 529 U.S. at 483-84 (stating that except for substituting the word "constitutional" for the word "federal," § 2253 codified the pre-AEDPA standard announced in *Barefoot v. Estelle*).

Where, as present here, a district court has rejected constitutional claims on their merits, the COA standard is straightforward.  "The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack*, 529 U.S. at 484.  The Court has reviewed the record of this case and finds that reasonable jurists would not find the Court's assessment of the constitutional claims debatable or wrong.  On the merits of this case, reasonable jurists would not debate the constitutionality of Petitioner's conviction and sentence.  Accordingly, the Court

declines to issue a certificate of appealability.

## **CONCLUSION AND ORDER**

For the reasons discussed above, the Court DENIES the Petition for Writ of Habeas Corpus with prejudice and DECLINES the issuance of a certificate of appealability. The Clerk of Court is to enter Judgment for Respondent and to close Case No. CV F 08-00817 LJO WMW HC.

IT IS SO ORDERED.

**Dated:      April 7, 2009                         /s/ Lawrence J. O'Neill**
                                                        UNITED STATES DISTRICT JUDGE